IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JIMMY PEREZ OLIVO,

    Plaintiff,

    v.

ED GONZALEZ, et al.,

    Defendants.

CIVIL NO. 01-1515 (RLA)

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

    Plaintiff, JIMMY PEREZ OLIVO, an inmate at the Bureau of Prisons facility at MDC Guaynabo (MDC) brings this *pro se* action under Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971), against nine individual defendants federal employees at MDC alleging violations of his civil rights under the Fifth, Eighth, and Fourteenth Amendment of the United States Constitution.  Plaintiff's main claim is based on the alleged use of restraints on him during an escorted medical trip which he argues is in violation of Bureau of Prisons (BOP) policy and submitted him to unnecessary punishment, discomfort and physical pain for more than three (3) hours, resulting in bruised ankles and pain for a period of eight (8) days.

    Plaintiff seeks declaratory judgment establishing that his civil rights were violated; monetary relief for the alleged damages he sustained in the amount of $3,500,000.00, a Mandamus to compel MDC officials to comply with the parameters of the administrative remedies, and protection against possible retaliatory actions.

**CIVIL NO. 01-1515 (RLA)**                                                                 **Page 2**

Defendants, ED GONZALEZ, OSCAR BARAT, ORTIZ-AVILES, SENIOR OFFICER RODRIGUEZ, ANGEL MIGUEL MONTALVO, MIMI POTTS and JORGE L. PASTRANA have moved the Court to dismiss the complaint on the grounds of qualified immunity and failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(1), (b)(2) and (b)(6), and/or for summary judgment (docket No. **20**). Plaintiff has opposed (docket No. 22). For the reasons discussed herein, the Court GRANTS defendants' motion as set forth below.

<u>QUALIFIED IMMUNITY</u>

The qualified immunity defense must be affirmatively pled on behalf of the defendant, or it will be waived. <u>Gomez v. Toledo</u>, 466 U.S. 635 (1960). A defense of qualified immunity is evaluated by using a two-prong test, requiring a finding as to (1) whether the constitutional right is clearly established at the time of the violation, and (2) whether "a reasonable officer in the same situation would have understood that the challenged conduct violated that established right." <u>García v. Royal Bank of Canada</u>, 178 F. Supp.2d (D.P.R. 2001); <u>Cestero v. Rosa</u>, 198 F. Supp.2d 73 (D.P.R. 2002).

The first prong of this test establishes that the qualified immunity defense provides government officials with a shield from liability "for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 812 (1982). The <u>Harlow</u> court

noted that even if the right were clearly established, a suit might still be barred "if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known the relevant legal standard...." Id. at 819.

The District Court of Puerto Rico has explained, in applying this prong, that

> the Supreme Court required a court deciding questions of qualified immunity to employ a 'full knowledge of its own and [other relevant] precedents.' The right must be clear enough for a public official to understand the unlawfulness of the alleged action. Although it must be expressed in the law at a particularized level, an official does not need to be told explicitly what he cannot do. The right allegedly violated must be established at the time of the purportedly objectionable conduct, and the connection between the conduct and the right invoked must be direct. 'In mounting this inquiry, courts may neither require that state actors faultlessly anticipate the future trajectory of the law... nor permit claims of qualified immunity to turn to the eventual outcome of a hitherto problematic constitutional analysis.

El Día v. Rosselló, 20 F. Supp.2d 296, 303 (D.P.R. 1998).

In determining whether there is a clearly established right to be free from restraints, or a liberty interest in being free from restraints, prior to 1995, the Supreme Court looked at the language utilized in the regulations governing the matters giving rise to the complaint. See Hewitt v. Helms, 459 U.S. 460 (1983). Under this analysis, in Roy v. Carter, 1992 WL 109058 (N.D. Ill. 1992), a case factually similar to this action, the District Court of Illinois stated:

> To create a constitutionally protected liberty interest, a regulation or statute must employ "language of unmistakenly

**CIVIL NO. 01-1515 (RLA)** **Page 4**

> mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed," and the regulation must impose "substantive predicates" on the official's decision. The use of guidelines to "structure the exercise" of the decision-makers' discretion does not necessarily create a protected interest. Thus, in order to create a protected liberty interest, the regulations must limit an official's discretion to "objective and defined criteria", and must require the application of rules to facts, as opposed to being discretionary. Roy v. Carter, 1992 WL 109058 at 3 (internal citations omitted).

The Roy court looked at the language of the regulation and engaged in the following analysis:

> [T]he regulation provides that the correctional supervisor "may authorize" physical restraint over an inmate who appears to be dangerous. The "may" language cannot be considered "unmistakenly mandatory in character." If section 552.21 were "intended to substantively restrict officials" discretion relative to physical restraints, it would have been drafted so as to reflect far more restrictive language." Since it was not, "[a]nd because the liberty and property of a prisoner are defined by the substantive rules of positive law, the absence of such rules is dispositive." We decline "to presume that the regulation intended to place substantive limits on the authority of prison administrators when it has not explicitly said so." Based on the foregoing, we find that the language of section 552.21 creates a procedural structure to regulate the exercise of official discretion without imposing substantive limitations upon the prison officials' decision-making. The court thus concludes that the applicable regulations do not create a protected liberty interest and we, therefore, do not reach the issue of what process is due.
>
> Id. at 4 (internal citations omitted).

The language of the BOP policy on this issue is permissive just as the language in Roy; it empowers correctional workers to make decisions regarding the use of restraints on inmates going on escorted trips. Thus, Code of Federal Regulations, Title 28,

§ 570.44, involving Supervision and Restraints Requirements during an escorted trip, indicates:

> Inmates under escort will be within the constant and immediate visual supervision of escorting staff at all times.  Restraints may be applied to an inmate going on an escorted trip, after considering the purpose of the escorted trip and the degree of supervision required by the inmate.

This regulation without any doubt confers on staff the discretion to apply restraints on an inmate going on an escorted trip.  Indeed, Bureau of Prisons Program Statement 5538.04, <u>Escorted Trips</u>, (December 23, 1996), uses the same language of the Code of Federal Regulations.

In addition, at the time of the incident, plaintiff was classified as "out custody".  In accordance to the policy applicable to "out custody" inmates, "[r]estraint equipment may be used at the discretion of the escorting officer(s)."  Statement of Material Uncontested Fact Number 2.  Therefore, it was really within the staff's discretion to apply restraints to plaintiff given his custody level.  Under this analysis, it is clear that the regulations do not create a liberty interest in being free from restraints.

Accordingly, if the defendant, while in the process of performing a discretionary function, could reasonably have believed that his conduct was lawful, he will be protected from liability by qualified immunity.  <u>Foster v. McGrail</u>, 844 F. Supp. 16 (D. Mass. 1994).  "The purpose of the doctrine of qualified immunity is to serve as a counterbalance which permits public officials to engage in

**CIVIL NO. 01-1515 (RLA)**                                                  **Page 6**

'effective and vigorous execution of governmental policies and programs.'" <u>El Día, Inc.</u> at 296. To hold otherwise would no doubt undermine the authority of prison officials in the orderly administration of prisons.

More recently, Supreme Court jurisprudence has changed the methodology of examining the language of a prison regulation to determine whether a liberty interest is created. In <u>Sandin v. Conner</u>, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court announced that it will no longer look to the language of a particular regulation to determine whether a protected liberty interest has been created. 115 S.Ct. at 2300. Liberty interests protected by the Due Process Clause may still be created, but these interests are limited to those which relieve inmates from a restraint which differs significantly from the normal incidents of prison life. <u>Id</u>. To establish a constitutional violation, inmates must show a violation of a liberty interest of "real substance" that results in a "grievous loss of liberty" retained even after imprisonment. <u>Sandin</u>, 115 S.Ct. at 2298.

The <u>Sandin</u> case shows that it is the nature of the deprivation which controls whether there is a liberty interest. In <u>Sandin</u>, even the disciplinary placement of an inmate in segregated confinement did not support a finding of a liberty interest. It simply is not an action which "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Sandin</u>, 115

S.Ct. at 2299. See also, Reno v. Koray, 515 U.S. 50, 63, 115 S.Ct. 2021, 2028, 132 L.Ed.2d 46, 58 (1995)("'Detained' defendants are subject to BOP's disciplinary procedures; they are subject to summary reassignment to any other penal or correctional facility within the system, and, being in the legal custody of the BOP, the Bureau has full discretion to control many conditions of their confinement.") (internal citations omitted.)

Similarly, in this case, the use of restraints on an inmate going on an escorted trip to the community does not impose any atypical and significant hardship on the inmate. On the contrary, in light of BOP program statements, it is expected, in these circumstances, that inmates would be placed in restraints. Therefore, defendants' actions were not violative of any rights of plaintiff protected by the Constitution. On the contrary, these defendants acted within the mandates of policy.

After finding that there is a clearly established right, the second prong of the qualified immunity test examines the reasonableness of the defendant's conduct in light of clearly established federal law. Malley v. Briggs, 475 U.S. 335, 345 (1986). Therefore, the defendant's conduct is "analyzed according to an objective, rather than subjective, standard of reasonableness." McGrail 844 F. Supp. at 23 (D. Mass. 1994). In this case, plaintiff had no clearly established right to be free from restraints; therefore, there is no need to proceed to the second prong of this

**CIVIL NO. 01-1515 (RLA)**                                                                      **Page 8**

analysis. Since there is no constitutional right established, there is no question about due process.

### THE LEG IRONS AS PLACED DID NOT VIOLATE PLAINTIFF'S RIGHTS

Plaintiff claims that as a result of the allegedly improper application of the leg restraints he suffered discomfort, ankle bruises, and pain for a period of eight (8) days. Plaintiff contends that staff violated BOP's policy in that the leg irons were supposed to be placed over socks, and not on skin.

In cases where there are allegations of excessive use of force against inmates, the proper standard is that of unnecessary and wanton infliction of pain promulgated in Whitley v. Albers, 475 U.S. 312 (1986). In that case, the United States Supreme Court deferred to the prison administrators in their use of force, namely the use of shotguns, during a disturbance in which an inmate was shot in the leg after failing to obey a command from the officer. The Court stated that infliction of pain during a situation that warrants the imposition of security measures does not violate an inmate's constitutional rights. See also Daniels v. Williams, 474 U.S. 327 (1986); Farmer v. Brennan, 51 U.S. 825, 128 L.Ed.2d 811, 837-38 (1994). Thus, not every decision made by the prison administrators that affect inmates is subject to constitutional scrutiny. Whitley, supra, at 319.

The Court's inquiry will focus on whether the measure taken that inflicted the pain and suffering was applied in a good faith effort

to control a dangerous situation. Id. In so doing, the prisoner's claim that officials used excessive force will be evaluated in terms of "whether force was applied in a good faith effort to maintain or restore prison discipline or maliciously and sadistically to cause harm." Id. at 319. The Court must examine "the need for the application of force, the relation between the need for the application of force and the amount of force that was used, and the extent of the injury inflicted." Id. The Court will also evaluate "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." Id. at 321.

In Hudson v. McMillian, 503 U.S. 1 (1992), a convicted inmate brought a Bivens action against prison guards for allegedly beating him while he was handcuffed in violation of the Eighth Amendment. The Hudson Court recognized that prison administrators must make decisions "in haste, under pressure, and frequently without the luxury of a second chance." Id. at 5 (quoting Whitley, supra, at 320). Correctional officers must continuously balance "the need to 'maintain or restore discipline' through force against the risk of injury to inmates." Id. The Supreme Court recognized that "not every push or shove, even if later seen unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Id. at 9 (quote omitted).

**CIVIL NO. 01-1515 (RLA)** **Page 10**

The First Circuit has adopted the <u>Whitley</u> standard and has indicated that "officials cannot be expected to measure nicely the precise amount of force necessary to restore order." <u>Unwin v. Campbell</u>, 863 F.2d 124 (1st Cir. 1988). See <u>Robles v. Ramos</u>, 729 F. Supp. 920, 923 (D.P.R. 1989) (holding that the question in an excessive use of force lawsuit is "whether the deadly force used by [the defendant] was applied in a good faith effort to preserve the orderly running of the institution or maliciously and sadistically for the very purpose of causing harm.")

"[To] [establish] [an] Eighth Amendment [violation]; defendant must have had actual knowledge of impending harm easily preventable so that conscious, culpable refusal to prevent harm can be inferred from failure to prevent it, or defendant must have deliberately avoided acquiring knowledge of impending harm." U.S.C.A. Const. Amend. 8.

In the action before us, the staff of the MDC involved in applying the restraints to plaintiff did not use excessive force nor did they place the restraints to "cause [plaintiff] pain and suffering." Plaintiff's Complaint, pages 14-15. In this case, the Acting Lieutenant did not deliberately inflict pain in the manner in which he placed the restraints over plaintiff's skin; he was following the BOP's standard practice and the Captain's instructions on the matter.

**CIVIL NO. 01-1515 (RLA)**                                                     **Page 11**

The Basic Prisoner Transportation, Participant Manual from the Staff Training Academy states that:

"Leg Irons applied properly - The student (officer) should:

- Apply leg irons against shin[sic], **not over clothing**, above ankles and below calves;

- Ensure leg iron fit snugly, **touching the skin on both sides**, but not making indentations in the skin."

(Emphasis added). Statement of Material Uncontested Fact Number 3. All officers must successfully complete this training in order to be employed in a federal penal institution. The Staff Training Academy Manual clearly establishes that leg restraints will be applied on direct contact with the skin. Furthermore, the BOP Program Statement prays: "While the proper application of restraints may result in some discomfort, examples of prohibited uses of restraints would include, but are not limited to: hogtying, unnecessarily tight restraints." Statement of Material Uncontested Fact Number 4.  Therefore, the Acting Lieutenant's action of correcting the restraints, to apply them on the skin was not a malicious, wanton or deliberate act. The Acting Lieutenant was complying with the Bureau of Prisons' standard practice. For obvious security reasons, the restraints would not be placed over the socks as depending on the thickness of the socks the inmate could attempt to remove the restraints. Plaintiff contends that no restraints were placed on him during other medical trips. However, this allegation is inconsequential, as the placement of

**CIVIL NO. 01-1515 (RLA)**                                                                                    **Page 12**

restraints is clearly discretionary, as specified in the program statement dealing with this issue.

In light of the above, the defendants exercised their best correctional judgment in applying restraints to plaintiff.

<u>AGENCY'S ALLEGED FAILURE TO TIMELY RESPOND
DOES NOT CONSTITUTE VIOLATION OF PLAINTIFF'S DUE PROCESS RIGHTS</u>.

Plaintiff contends that the Central Office, in the last stage of the appeal process of his administrative request regarding the placement of restraints which gives rise to plaintiff's complaint, failed to provide an answer to his claim. Plaintiff contends that this failure violates his due process rights and constitutes a concession that the facts occurred as depicted by plaintiff.

A review of the records reflects that plaintiff exhausted all the administrative procedures. The alleged injury took place on May 12, 2000. On July 13, 2000, plaintiff filed a Request for Administrative Remedy (hereinafter "BP-9), which was denied on August 22, 2000. On October 26, 2000, plaintiff filed a Regional Remedy Appeal, which was also denied on December 18, 2000. On January 19, 2001, plaintiff filed an appeal to the Office of the General Counsel, which was denied on February 26, 2001. The Bureau of Prisons responded to all three levels of appeals filed by plaintiff through the administrative remedy program. Statement of Material Uncontested Fact Number 6.

**CIVIL NO. 01-1515 (RLA)**                                                          **Page 13**

In any event, even were we to assume that the Central Office failed to respond to plaintiff's last appeal, the Code of Federal Regulations states as follows:

> If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level.

28 C.F.R. § 542.18. Clearly, if the inmate did not receive the Central Office's response, he was to construe the lack of a response as a denial of his claim. Consequently, failure to provide an inmate with an answer does not constitute a concession of the facts as stated by the inmate.

### CLAIMS AGAINST GOVERNMENT OFFICIALS IN THEIR OFFICIAL CAPACITY ARE CONSTRUED AS CLAIMS AGAINST THE GOVERNMENT

"Official capacity" suits generally represent only another way of pleading an action against the entity of which an officer is an agent. Kentucky v. Graham, 473 U.S. at 165. Thus, when a plaintiff sues a federal official in his official capacity, in reality the complaint seeks to impose liability on the United States. Brandon v. Holt, 469 U.S. 464, 471 (1985). Relief in "official capacity" suits, when granted, affects the defendant's office or position rather than his personal assets.

With respect to traditional damage suits for constitutional torts, qualified immunity simply does not apply to "official capacity" claims because absent a specific waiver, sovereign immunity bars suit. As one court explained, "[t]here is no such animal as a

**CIVIL NO. 01-1515 (RLA)**                                                **Page 14**

Bivens suit against a public official tortfeasor in his or her official capacity.  Instead, any action that charges such an official with wrongdoing while operating in his or her official capacity as a United States agent operates as a claim against the United States." Farmer v. Perrill, 275 F.3d 958 (10th Cir. 2001) (citations omitted). "Because a Bivens claim may not be brought directly against the United States as such, an 'official capacity Bivens suit' would be an oxymoron."  Id., (citing FDIC v. Meyer, 510 U.S. 471, 484-85; accord Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000) ("Bivens action only may be brought against federal officials in their individual capacities"); see Affiliated Professional Home Health Care Agency v. Shalala, 164 F.3d 282, 286 (5th Cir. 1999); Buford v. Runyon, 160 F.3d 1199, 1203 (8th Cir. 1998); Sánchez-Mariani v. Ellingwood, 691 F.2d 592, 596 (1st Cir. 1982).

In this action, plaintiff attempts to sue the defendants federal employees in their "official and individual capacities."  In view of the above, the complaint against the individual defendants in their official capacities is treated as a suit against the BOP.  However, inasmuch as a Bivens action cannot be prosecuted against the United States and its agencies because of sovereign immunity, see FDIC, 510 U.S. at 484-85; Ruiz Rivera, 209 F.3d at 28; any claims included in the complaint against the defendants in their "official capacities" must be and are hereby DISMISSED with prejudice.

<u>*RESPONDEAT SUPERIOR* IS NOT APPLICABLE TO A BIVENS ACTION</u>

A <u>Bivens</u> action may only be brought against federal officials in their individual capacities. Even then, plaintiff must state a claim for direct rather than vicarious liability, as the *respondeat superior* theory is not a viable theory of <u>Bivens</u> liability. <u>See Bibeau v. Pacific Northwest Research Found</u>, 188 F.3d 1105, 1114 (9th Cir. 1999); <u>Buford</u>, 160 F.3d at 1203 n. 7; <u>Cronn v. Buffington</u>, 150 F.3d 538, 544 (5th Cir. 1998); <u>Simpkins v. District of Columbia Gov't</u>, 108 F.3d 366, 369 (D.C. Cir. 1997).

To be sure, supervisors sometimes may be held liable for failures in carrying out their supervisory responsibilities. <u>See e.g.</u>, <u>Camilo-Robles v. Zapata</u>, 175 F.3d 41, 43-44 (1st Cir. 1999). However, be that as it may, supervisory liability exists only where "(1) there is subordinate liability, and (2) the supervisor's action or inaction was 'affirmatively linked' to the constitutional violation caused by the subordinate." <u>Aponte Matos v. Toledo Davila</u>, 135 F.3d 182, 192; <u>Ruiz Rivera v. Riley</u>, 209 F.3d 24, 28.

The supervisor's involvement in the allegations made by the plaintiff must rise to the level of reckless or deliberate indifference to the rights of plaintiff protected under the United States Constitution. <u>Gutiérrez v. Cartagena</u>, 882 F.2d 553, 562 (1st Cir. 1989). Therefore, the plaintiff could only recover from the supervisor's own actions or omissions. <u>Bowens v. City of Manchester</u>, 966 F.2d 13, 20 (1st Cir. 1992). Absent personal involvement in, or

...

**CIVIL NO. 01-1515 (RLA)**                                                                         **Page 16**

personal knowledge of, the alleged unconstitutional acts, the named defendant federal supervisor must be dismissed as a <u>Bivens</u> defendant.

Moreover, the plaintiff must allege facts that demonstrate that the supervisory official had direct involvement or knowledge of the situation giving rise to the plaintiff's injury. <u>Ramírez v. Colón</u>, 21 F. Supp.2d 96, 98 (D.P.R. 1997).

Plaintiff has made no specific allegations against ED GONZALEZ (Former Warden at MDC Guaynabo), JORGE L. PASTRANA (current Warden at MDC Guaynabo), and MIMI POTTS (Former Associate Warden of Programs at MDC Guaynabo on May 12, 2000), alleged supervisors at MDC Guaynabo. Plaintiff has failed to articulate what specific actions of GONZALEZ, PASTRANA, or POTTS violated his constitutional rights. Accordingly, any claim against these defendants, as supervisors, must be and are hereby DISMISSED.

In light of the above, defendant's Motion to Dismiss and/or For Summary Judgment (docket No. 20) is **GRANTED** and the Complaint is hereby DISMISSED.

IT IS SO ORDERED.

San Juan, Puerto Rico, this 26th day of August, 2005.

                                              <u>S/Raymond L. Acosta</u>
                                               RAYMOND L. ACOSTA
                                       United States District Judge